No. 30.—L. J. DAVIS, and others, plaintiffs in error, *vs.* H. F. SMITH, and others, defendants.

[1.] In the distribution of the assets in the hands of an administrator, judgments obtained against the intestate have priority over debts for rent, bonds and other obligations, notes and open accounts, and stand next in dignity to debts due the public, and to be paid according to their date.

[2.] Promissory notes are upon the same footing with *bonds and other obligations*, and are to be paid *rateably* with them.

Davis and others *vs.* Smith and others.

[3.] A surety who has paid the debt of his principal is subrogated to all the rights of the payee, in the distribution of the assets of his deceased principal, and is to be paid *rateably* according to the dignity of the debt so by him paid.

[4.] A covenant of warranty of title, when broken, is a specialty, and the damages due thereon are to be paid *rateably* with bonds or other obligations.

[5.] The measure of damages for the breach of a covenant of warranty of title, is the purchase money with interest from the time of the sale of the land.

[6.] Judgments obtained against an administrator after the death of his intestate, rank no higher than the demands on which they are founded.

[7.] It is the duty of an *administrator*, when sued by a creditor, so to plead as to protect the rights of all the creditors of the estate, as fixed by law, of whose demands he has notice, and if he fail to do so, he becomes personally chargeable.

[8.] An *administrator* is not made personally liable for failing, in a suit against him by a creditor, to plead an outstanding *covenant of warranty* made by his intestate, if at the time of the rendition of the judgment in such suit, there was no breach of the covenant.

[9.] A sells a tract of land to B taking his notes for the purchase money, and executing his bond for titles, when the purchase money is paid. A receives one half the purchase money, when B sells the land to C, executing his deed with a warranty of title, C buying *bona fide* for value,'without notice that the legal title is in A. After the sale to C, and with knowledge of that fact on the part of A, A and B enter into a verbal agreement that in payment of the balance of the purchase money due from B to A, B shall take up a note made by A to D by substituting his own therefor, and that A will become his surety, and that if A is compelled to pay the debt thus made by B to D as surety—then the purchase money due from B to A on the original sale of the land shall be again considered as due, and A shall hold the legal title of the land as security for its payment. A pays the surety debt to D, and sues for and recovers the land from C, evicting him upon his legal title. · B dies, and the *administrator of B* files his bill asking direction of chancery as to the distribution of the assets among the creditors. A and C are both made parties to the bill, and answer. A claims to be paid his purchase money to the exclusion of other creditors, and C claims to be paid his damages for the breach of his covenant of warranty from B. *Held,* that the substitution by B of his note in lieu of A's note to D, is a payment of the purchase money due by B to A upon the original sale of the land, and that if the verbal agreement is considered as of force, then, in equity A is not entitled to be paid, out of the assets of B, his purchase money; and farther, that A having elected to rescind his original contract with B by resorting to his legal title to the land, and evicting C, by which the estate of B is made manageable, upon his warranty to C, he, A, is to be held to his election, and shall refund to the estate of B the amount of the purchase money which he has received, with interest.

[10.] An *administrator* can neither sue nor be sued in another State, by virtue of letters derived from the authorities of Georgia. If therefore,he is notified to appear and defend an action of ejectment brought in the State of Alabama, against one to whom his intestate has sold the land sued for, with a covenant

of warranty, and he disregards the notice, he is not thereby made liable as for a *devastavit*.

[11.] A judgment obtained in another State, has in this State the force of a domestic judgment; yet it may be here impeached for fraud, and the jurisdiction of the Court which rendered it inquired into, as also the right of the foreign State to exercise authority over the persons who are parties, and the subject matter.

[12.] A judgment in ejectment rendered in another State, and eviction under it, with the limitations last above stated, is evidence of a breach of a covenant of warranty in Georgia.

[13.] A fraudulent combination to procure a judgment and eviction, between the covenantee and the plaintiff in ejectment, will preclude the idea of an eviction upon title paramount.

[14.] The eviction, to constitute a breach of a warranty of title, must be founded on a title paramount.

In equity, Muscogee Superior Court, before Judge ALEXANDER, May Term, 1848.

The facts are incorporated into the opinion of the Court.

JONES, BENNING & JONES, for plaintiffs in error.

1. "A payment by an administrator, of a simple contract debt, before a bond conditioned for indemnity, is good, if no breach of the condition has taken place." 2 *Wms. Ex'rs.* 672, 745.

So, a judgment obtained against an administrator, upon a simple contract debt, before a breach of such condition, may be pleaded by the administrator, against a suit founded on a subsequent breach, as evidence of a debt to be paid to him out of the assets, in preference to the damages occasioned by that breach.' 2 *Wms. on Ex'rs,* 676, '7, 1212, '13, '14, 678, '9, '80. *(Ed. of* 1832.) *Read vs. Blunt,* 5 *Sim.* 567. *Norman vs. Baldry,* 6 *Sim.*

2. The measure of damages for a breach of warranty, is not the purchase money and interest, from the time of purchase. 2 *Green. Ev.* §264 & *Note* 4.

3. The payee or indorsee of a promissory note, has a right to be preferred in the order of payments, by an administrator, to a surety, who had signed as surety at the foot of the note, and afterwards had had to pay it off. *(See next point.)*

4. Promissory notes are included in the expression, "bonds or obligations," used in section X. of the Act prescribing the order of payments to be observed by the representatives of deceased

Davis and others *vs.* Smith and others.

persons. *Prince's Dig.* 239. *Watkin's Dig.* 404, *Act of* '89. *do.* 424. *Act of* 1790. *do.* 488. *Act of* '92. *do.* 627. *Act of* '97 *Prince*, 426. *Act of* '99. *Chitty Cont.* 1, 2. *Bac. Abr. Obligations, par.* 1.

5. The fact that the demands of Davis, and others, had been reduced to judgments against the administrator,did make a difference in their favor, in comparison with the demands at large, mentioned in the bill. And such judgments did have a lien, or claim. on the assets, superior to that of Smith's demand; for such judgments could seize and sell the assets in the hands of the administrator, in spite of all that those demands could do to the contrary. If the administrator did not so plead as to reserve their proportion of the assets for them, he only made himself personally responsible to them, for any deficiency in their shares, resulting in consequence of that judgment's getting an over-proportion. And therefore, it would be necessary for them to look to his (the administrator's) own goods, to make up such deficiency, instead of to the over-proportion of assets; which the said judgments, owing, perhaps, to the default of the administrator in his pleading, had obtained control of; otherwise judgment creditors would be deprived of all benefit to be derived from the conclusive presumption, against the administrator, of sufficient assets—which arises from his letting general judgments go against him. *Wms. Ex'rs, Bot. (Ed.* 1832.)

6. If a debtor, by getting his creditor to go his surety, borrows money on the strength of the suretyship, and with it pays off this creditor the debt which he owed him, that debt remains paid, notwithstanding the surety may have afterwards to pay the borrowed money. *Eq.* §449, *b.* 449, *d.*

7. A verbal agreement between a principal and a surety, that a piece of land which had been bought by the former of the latter, under bond for the payment of the purchase money, paid for in part, and as to the other part, was to be paid for by the money to be raised on their note, and which land had been sold, and by deed conveyed by the said principal to a third person, with the assurance that he had a perfect title, and which was, at the time of the agreement aforesaid, in the possession of that person, a possession taken by him under that deed, and as an innocent purchaser for a valuable consideration, should be held by the surety as indemnity against loss by the suretyship, was either void,

1st. Because violating the Statute of Frauds. *Pr. Dig.* 915, and

2d. The 32*d. Henry VIII. Sch. Dig.* 191, 2.

3d. Because the principal had then, no title whatever to the land.

Or at least was incapable of giving any rights to such surety, except such as were subordinate to those acquired by the last purchaser; for even if the equities were equal, the maxim *qui prior est in tempore potior est in jure,* would govern.    1 *Story's Eq.* §§365, 6, 7.

8. There was evidence in the case, going to show that the eviction of the Laneys by Smith was collusive, and by consent between them, for,

1st. The evidence proved that they (the Laneys) had a complete *equitable* title to the land.    And this was an ample shield. See 2 *or* 3 *points in brief, for* Woolfolk, *in* Watkins vs. Woolfolk.

2d. In fact, it went farther, and showed that they had the legal title, the whole estate in themselves, by virtue of the Statute of Uses.    Before this Statute, a mere contract unenrolled, by one to sell his land to another, was sufficient without words of inheritance to pass the equitable fee to the vendee.    1 *Sug. Pow.* 93. After that act, it was sufficient to pass, also, the legal fee, except in a few classes of cases.    A little later in the same Parliament, it was provided by another act, that a bargain of sale which is merely a contract to convey, *(2 Black. Com.* 339,*)* Error should not enure to pass a freehold, unless sealed and enrolled, *(1 Serg. Pow.* 73,*)* but should (as the Courts construed the act) be utterly void.    But this last Statute has never been in force in this State, at least not since 1755.    *Pr. Dig.* 155.    Nor has there been any other law in operation which avoided deeds, merely for want of enrollment.    That defect has served only to postpone elder unrecorded deeds to younger recorded ones.    Now a penal bond, conditioned to be void if the obligor, shall, on being paid the purchase money, make the obligee a title to the land purchased, implies a contract by which the obligor *agrees to convey* the land to the obligee, whenever the purchase money shall have been paid.    2 *Stor. Eq.* §715.    That is to say, a contract to convey the land on the happening of a contingency.    This makes a contingent use.    2 *Black. Com.* 332, *et seq.*    Which was good as a use before the Statute.    1 *Sug. Pow.* 73, *& Black.*    If, and as it is not, either

1st. A use in a term of years—

2d. Or a use upon a use—

3d. Or a "special" use. 2 *Black.* 332. *Sewin on Trusts,* 53. 3 *Kelly,* 368.

And as the said Statute of enrollment was not in force at the time when it was raised, supposing that such contract amounts to a bargain and sale, which it does not, and as the purchase money has all been paid, it is a use executed by the Statute. *Pitts vs. Bullard,* 3 *Kelly,* 5, *and cases cited.*

3d. The evidence farther shows that the Laneys, by means of the eviction, got into a position where they might claim. as preferred creditors, $400 and interest, (the purchase money,) in piece of land, sworn to be worth only $200. And that, too, after retaining to themselves mesne profits, say 1837 to 1847. And that Smith, by the same means, acquired land worth $2000, in place of his right to indemnity, for having paid the surety note of $2320, a right, which, in the deficiency of the assetts left by Harris at his death, was utterly worthless. Can there be a doubt of collusion ?

9. If the patent to Smith was younger than Harris's warranty, it was evidence of a title adverse, and paramount to Harris's, existing at the time of his making the warranty. 2 *Green. Ev.* §244. *Edis vs. Welch,* 6 *Mass.*

10. No suit can be brought by or against an administrator in his official capacity, in the Courts of any State except of that from which he derives his letters of administration. *Story Conf.* §513. 9 *Wheat.* 566. *Kerr & Moore.* And if he cannot be a party, he cannot be a privy. Therefore, no judgment against him, obtained out of his State, can be evidence of any fact to his prejudice.

11. That judgments against administrators have a lien on assetts, see point 6, and that they are entitled to satisfaction & of the assetts in preference to creditors at large, Smith. See also, points 3 & 4.

12. If a contract between vendor and vendee be re vendor gets the land back besides the rents, subject ces for lasting repairs and substantial improvemen *Ven.* 289, *top p.* 396, 7 *bottom p. Danovan vs. Fu* 105, 6. Smith elected so to rescind by entering upon a ing Harris's assignee, as he had a right to do by reason of Harris's insolvency and death before full payment for the land. 1

*Sug. Ven.* 309, *top*, 428, *bottom.*   (Citing, &c.)   *Chitty on Cont.* 741, 2.

JOHNSON & WILLIAMS, for defendants in error.

Upon the eviction, the said Harris became indebted to the Laneys, by *specialty.*   2 *Williams' Executors,* 735.   *Ibid,* 740.

Though the debt be contingent, and depend on condition, when the breach occurs, it then ranks according to its dignity, as if absolute.   2 *Williams' Exrs.* 744.   *Ibid,* 746.

The measure of damage is the purchase money with interest thereon.   4 *Kent's Commentaries,* 474, *and authorities there cited.*

The Judge may refuse to charge if the request is abstract, and if there is no evidence, the Court may so say.   2 *Peters' Dig.* 134. 9 *Peters* 292.   1 *U. S. Digest,* 419.

Brief of authorities for H. S. SMITH :

The land was not paid for by the change of papers and notes, and the vendor retained his lien for the unpaid purchase money. 3 *U. S. Digest,* 121.   5 *Johnson,* 68.   5 *Conn.* 265.   5 *Porter,* 452.

The indorsement of a note does not extinguish the lien of a vendor.   *Ala. Reports*

The question of payment is a question of intent.   *Story on Promissory Notes,* 477.

The demand of Smith is liquidated, and of equal dignity with a promissory note.   *Prince's Digest,* 228.   1 *Kelly,* 287.   2 *Kelly,* 374.

When the equities are equal, he who has the legal title shall prevail. 1 *Story's Equity,* 75.   7 *Cranch.* 34.   1 *Vesey,* 247.   *Ibid.* 387. 2 *Johnson,* 608.   3 *Johnson,* 359.   1 *Atkins,* 228.   10 *Peters and the authorities there cited,* 210.   7 *Al.* 318.   3 *Johnson,* 359.

A party must do equity before he asks equity.   1 *Story's Commentaries.*

By the Court.—NISBET, J. delivering the opinion.

The facts in this case are numerous, and so are the points presented for our consideration.   I state such facts as appear to be necessary to an understanding of the case generally, leaving minuter specification for each question as it arises.   Abner H. Flewellen, administrator upon the estate of N. H. Harris, de-

ceased, filed a bill alleging the partial insolvency of the estate, and asking the directions of a Court of Chancery, in the payment of the debts. It exhibits the character of the debts, and the amount of assets, and asks process to bring the creditors into Court. Among the debts are a *judgment* against the intestate during his life—*judgments* obtained against the administrator, and debts by note and open account. Also a claim in behalf of the heirs and distributees of Noah Laney, deceased, founded on the breach of a warranty of title in a deed made by said Harris to said Noah Laney, when both were in life. The heirs and distributees of Noah Laney had previously filed their bill against the administrator, setting forth the sale of the land, the deed, the price paid, and that one of them, who was in possession, had been evicted by judgment of law in the State of Alabama, where the land lay, by H. F. Smith, who held title to it, paramount to theirs derived from Harris; and praying that their claim might be paid to the exclusion of other creditors. This bill was enjoined by that brought by the administrator Flewellen. The creditors answered, respectively setting up the grounds of their claims upon the estate, and stating grounds of objection to the allowance of other claims to the exclusion of theirs. The cause was submitted to the Court and jury, and various exceptions were taken to the instructions of the presiding Judge to the jury, and to his refusal to charge them according to the requests of counsel for the different parties defendants. The points made in the bill of exceptions, some of which we sustain, will be noticed as I proceed. The contest was as to the dignity, and prior claim of the debts due, or charged as being due. We will send the cause back, with instructions, which will cover all the matters in dispute between the parties.

The order in which debts of a testator or intestate shall be paid, is prescribed by the Act of 1792. The section of that Act which specifies this order, is in the following words: " The debts due by any testator or intestate, shall be paid by the executors and administrators, in the order following, viz. funeral and other expenses of the last sickness; charges of probate and will, or of the letters of administration; next debts due to the public; next judgments, mortgages and executions, the eldest first; next rent, then *bonds or other obligations,* and lastly, debts due on open accounts." *Prince,* 228, 229.

[1.] Judgments against the testator or intestate, are next after debts *due the public ;* and as there appears to be no debts of the character specified in the Act as of higher dignity, due by this intestate, *they* are first of all to be paid. About them there is no controversy.

[2.] It is singular that the Act of 1792 makes no provision whatever for promissory notes, *eo nomine.* They are not mentioned at all, and have no place assigned them, unless they are embraced in the words, *other obligations.* One of two suppositions is to be adopted in relation to the absence of all mention of promissory notes and bills, in this act. Either the omission was an oversight, or the Legislature considered them as embraced under the head of *other obligations.* The former is not reasonable. We cannot reasonably believe that they, in legislating upon this subject, should have overlooked altogether the most common and numerous class of debts. And if it had been considered an omission, the Legislature would long ere this have supplied it. Creditors by note would not have been permitted to continue at the mercy of administrators, executors, or even *Courts.* The Legislature have been silent on the subject since 1792, and that fact is conclusive as to the legislative construction of the Act. It is very plainly indicative, too, of the opinion of the profession and of the country. In our opinion, promissory notes were intended to be embraced in the class of debts designated in the Act as *other obligations.* We think this the most reasonable, the most equitable and the most convenient construction. It is argued that at Common Law bonds and obligations have priority over notes, and that the classification in the Statute does not alter the Common Law. The classification at Common Law is, debts of record, specialties, and then simple contracts, which latter, it is conceded, embrace notes of hand. It is not to be contended for a moment that, according to any definition, or rule, to be found in the books, notes are specialties. We, of course, assert no such thing. We say only that the Legislature of Georgia, in the exercise of an unquestioned power, have thought proper, for the purpose of the distribution of an intestate's estate, to class notes with specialties, leaving for other purposes the distinctions between them, as they exist by law. But to return. The classification under our Statute is different from what it is at Common Law. The Common Law designates one class by the generic

name *simple contracts*, which includes written contracts not under seal, and accounts, or any verbal undertaking to pay money. Our Statute does not use the generic term, simple contracts, but when that is located at Common Law, in the order of distribution, it places the specific term, or designation, open accounts. The greater includes the less, simple contracts include accounts, but the less does not include the greater. Open accounts do not include notes. Were the phraseology of our Statute the same with the Common Law, that is, had it said simple contracts, instead of open accounts, I should hold that, as at Common Law, notes would stand upon the footing of accounts. In very important particulars, notes are different from open accounts ; as for example, they constitute a wholly different species of evidence of a debt, and are negotiable. The Legislature did not intend to class notes with accounts—this is clear to my mind from the considerations stated. Nor did they intend, by omitting all mention of them, or of the generic Common Law term which includes them, to leave them to take refuge under the Common Law rule, which places them upon an equality with accounts, and, of course, below the grade of specialties. It seems far more reasonable to conclude that in the classification made, they intended to repeal the Common Law, and to raise notes in the distribution of estates, to the grade of *bonds and obligations.* To do so does not involve what might be called the legal absurdity of making notes, bonds or obligations. What we think they have done in this Act, and that only, is, by a fair implication to classify notes with bonds or obligations, in the payment of debts by the administrator or executor of a partially insolvent estate. I admit that this intention cannot be drawn from the meaning of bonds or obligations. These are contracts *under seal.* It is true at the same time, that it cannot be inferred, from the legal meaning of open accounts, that the Legislature meant to place notes upon the same level with accounts. It is not a forced or unnatural inference, that the Legislature meant to discard, for the, nonce, technical definitions, and by *bonds* to designate evidences of debt under seal to pay specific sums of money, as single bonds, and by other obligations, to designate all other written undertakings to pay money, whether under seal or not. Nor is this idea unsupported by the common use of the word obligations. In that use it is very commonly understood to mean a promise to pay money,

or to do, or not to do a particular thing, evidenced by writing. Why in a Court of Equity—why upon principles of justice, should bonds, or obligations, have a preference over notes? The reasons given are purely technical, to-wit, the debt is therein particularly specified and the party's seal is attached, thereby acknowledging the debt and affirming the contract. *Bac. Ab. Tit. Obligation, A.* These reasons apply, in part, to notes. Certainly they are merely technical. Whereas the reasons why notes and bills should rank higher than accounts, are laid in commercial expediency. They are the life of commerce—they are necessary to trade upon any large or useful scale. By their negotiability, they constitute a large proportion of the circulating medium of the country. *Relatively*, they are more important than what are technically called specialties.

Besides all this, in 1799, the Legislature declared that "all bonds and other specialties, and promissory notes, and other liquidated demands, bearing date since 9th of June, 1791, whether for money or other thing, *shall be of equal dignity, &c.*" *Prince*, object or purpose of negotiability, or whether it relates to and de-426. Now whether this equality of dignity refers alone to the clares a general equality, it is still proof that for some purposes the Legislature have abolished, in this State, the technical distinctions between notes and bonds. From that Act, therefore, we derive confirmation of our opinion. I am aware that the Act of South Carolina, of which ours is a literal copy, has received there a different construction. *See the Ex'rs of Harbison vs. the Adm'rs of Giles*, 1 *Bay*, 275. *Rippon's Ex'rs vs. Townsend's Ex'rs*, 1 *Bay*, 445. Ours, however, seems to us to be the more reasonable construction, and founded in the better policy. The Court below held that promissory notes are not embraced in the words *bonds or other obligations*, as used in *sec.* 10, *of the Act of* 1792, and that decision we, for the reasons given, reverse.

[3.] The presiding Judge instructed the jury, that the payee or indorsee of a promissory note, has no right of preference in the order of payment by the administrator, over a surety, who has paid the debt. This question has been determined by this Court, in accordance with the opinion of the Circuit Judge in this case. The question was made and argued at the last Cassville Term of this Court. To the opinion carefully prepared, in that case, I now refer, believing it unnecessary to repeat the argu-

ment here.   *Lumpkin vs. Mills,* 4 *Georgia Sup. Court Rep.* 343.

[4.] He also determined that the claim of the Laneys founded on a covenant of warranty in a deed, broken by eviction, rankked as a specialty, to be paid in average and proportion with other specialties, and the measure of damages upon a breach of a warranty of title to lands, is the purchase money, with interest from the time of the purchase.   Both of which decisions we affirm. About the former of these propositions, I apprehend there can be no doubt.   The warranty is an obligation—instrument under seal.   When there is a breach, the law considers the damage as due.   It is a debt by specialty.   "Debts by specialty, says Blackstone, are such, whereby a sum of money becomes, or is acknowled to be due, by deed, or instrument under seal.   Such as by deed of covenant, by deed of sale, by lease reserving rent, or by bond or obligation."   *Blackstone's Com.* 2 *book, p.* 465.   1 *Binn.* 254–5.   *T. R.* 307.   3 *V. & B.* 194.   2 *Wms. Ex'rs,* 747–8.   3 *Burrow,* 1380.   1 *P. Williams,* 429.   1 *Dick.* 315.

[5.] The question as to the measure of damages upon the breach of a covenant of warranty, has divided the most learned jurists of this country.   Some have held that the vendee is entitled to recover the value of the land, at the time of eviction, including its natural appreciation of course, and no more than its value then, if it has depreciated; others have held that he is entitled to recover the value of the land at the time of eviction, including the improvements which may have been put upon it; whilst the majority of jurists, and of the Courts of this country, and of the Courts of England, have adopted, as the most equitable, most permanent and expedient rule, the purchase money with interest from the time of the purchase.   A great deal may be said in favor of allowing the vendee, the value of the premises at eviction. Forcible illustrations are given in the books of its equity.   On the contrary, equally striking illustrations are furnished of its hardships.   In relation to which, I remark that no rule of law can be safe which is founded upon extreme cases.   The best rules are those which, upon general principles, operate, in the main, most beneficially to entire communities; which are uniform, and by their simplicity are most easily understood.   The rule last adverted to has not these elements of optimism, perhaps I should say, of utility.   It is not uniform, for in some cases, under its operation, as in case of great appreciation in the value of the land, the vendee gets more than is equitable, and in others, as where there is a

great depreciation, he gets less.   So also, *vice versa*, it is not uniform as to the vendor.   In favor of the purchase money with the interest, it may be said, that it is a uniform rule; it is easy of comprehension; easy of proof; and more than all this, it is a criterion of recovery and liability, which the parties may always establish for themselves.   It is right upon principle; it is the rule of the Common Law, and has received the sanction of the Courts of a majority of the States of our Union.   The history of it, at Common Law, will show that it has and does obtain in England.

The ancient covenant of waranty was a real covenant, binding upon the covenantor and the heir.   In suits upon this covenant, the recovery was in other lands equivalent in value to the lands sold, at the time of the sale.   There is no doubt but this was the mode and measure of recovery upon the old covenants of warranty. In *feudal* times, lands were esteemed more highly than money, for reasons growing out of feudal institutions, and the anti-commercial tendencies of the age.   Hence, the recovery was in lands. But what is important to notice, is, that in the earliest days of the Common Law, the *measure of recovery was the value of the land at the time the warranty was made.   Bracton de warrantia, lib.* 5, *c.* 13, *sec.* 5.   *Bro. tit. voucher, pl.* 69.   *Ibid, tit. Recover in value, pl.* 59.   *Year Book.* 30 *Edw. III.* 146.   *Ibid,* 19.   *Hen. VI.* 46 *a,* 61 *a.   Ballet vs. Ballet, Godb.* 151.   *Glanv. Lib.* 3, *c.* 4.   *Fletce. Lib.* 6, *c.* 23, *s.* 3, 4.   2 *Roll's Ab.* 772, 773.   *Cro. Car.* 456.   4 *Kent's Comm.* 475.   4 *Johns. R.* 1.

Inasmuch as a personal action would not lie upon the covenant of warranty, and when the value of money relatively to lands had risen, in consequence of the revival of commerce and the giving way of feudal institutions and policy, and after the introduction of alienations by bargain and sale, a new species of covenant was devised, to wit: the personal covenants of this day. Purchasers of land desired the personal security of the vendor, and hence are covenants of warranty, of *seisin,* and covenants for *quiet enjoyment, &c.*   Although we thus find engrafted upon the Common Law, a new security and a new remedy, yet we find no alteration made in the rule, as to the measure of the covenantor's liability upon a breach.   That continued the same.   I believe there is no case in the English books to show the contrary.   The recovery, instead of being in lands, as formerly, is now in money, yet the amount of it is regulated by the value of the

Davis and others *vs.* Smith and others.

land at the time of the sale, and that is considered to be, what the parties estimated it at, to wit: the purchase money. Upon eviction, the grantee recovers the purchase money, with interest, the interest being allowed to countervail his liability for *mesne* profits. 1 *H. Bla.* 17.   2 *W. Bla.* 1078.   4 *Kent's Comm.* 476.   4 *Johns. R.* 8.

Such is the rule of the Common Law, and it is right upon principle. The covenant in this case was a covenant of warranty of title. There was no covenant for quiet enjoyment, none against incumbrances. And as before stated, there was an eviction by judgment in Ejectment. The decision we now make, therefore, is in reference alone to the case—that is, it applies to a covenant of warranty upon eviction. What would be the measure of damages upon a breach of a covenant for quiet enjoyment, when the breach does not extend to a breach of a covenant of seisin in the same deed, or in a case where there is only a covenant for quiet enjoyment, we do not now determine. I will only remark, that in case there is only a covenant for quiet enjoyment, and the breach of that amounts to a total failure of title, Chancellor Kent holds, (and many other eminent men,) that the rule of damages is the purchase money, with interest, and no more. And farther, that when the covenant for quiet enjoyment follows a covenant of *seisin* in the same deed, the intent of the instrument appears to be, that the one covenant is merely auxiliary to the other; one referring to the title, and the other to the enjoyment of that title. A breach of the latter involves a breach of the former. It would seem to be unreasonable, that a purchaser should recover upon the covenant of *seisin* the full value of the estate, and also additional damages for being disturbed in the enjoyment of that estate. There are no precedents at Common Law for the recovery of more damages in the covenant for quiet enjoyment, than under a covenant of *seisin*. The covenant of *seisin* draws after it, the covenant for quiet enjoyment. " *Omne majus continet in se minus.*"

I say, however, that to my mind the rule of the Common Law is right on principle. In this contract, as in all others, the rule of construction is the *intention of the parties*. What is that? The grantor covenants that the grantee shall be undisturbed in his title. He undertakes that the title in the hands of the grantee is good, and will continue good. The land and its value is the subject matter of the contract. The grantor does not look beyond

the immediate transaction; that is perfect in itself. It embraces a sale—a transfer of title—a payment of a fair equivalent by the purchaser, and an undertaking by the vendor, to save him harmless from a failure of title. He, (the vendor,) cannot be presumed to contract in reference to any future condition of the estate which he sells, either to his loss by its natural appreciation, or its actual improvement, or to his gain by its depreciation. He does not submit himself and his heirs to the contingencies which run through many years, much less can he be understood as contracting for a liability to pay for improvements, which rest altogether within the discretion, or caprice, or folly of the purchaser. Wise men do not so contract. They avoid future chances of loss or disturbance, and repose upon what is written. A vendor, for example, *bona fide*, sells for a fair price one hundred acres of wild land. It becomes the site of a city, and its appreciation rises to millions, and the title fails. It is to be presumed that he guarantied to the purchaser, upon a contract which, perhaps, did not involve a thousand dollars, the payment of millions. In this country, and at this day, such a case is not merely hypothetical. It would seem that if he were thus liable when the title fails, there would be some equity in allowing him, in case of such appreciation, the title remaining good, to share it with the purchaser. Yet such an idea has never received the least countenance.

On the other hand, the purchaser takes the title for what that is worth *at the time.* The future appreciation, or depreciation, is a chance which he takes with it. The improvements are with him, but he has the right to ask security against the failure of the title. He may ask security in any amount; covenants of any kind; but he asks and takes security against the failure of title alone. It is a personal security—it is available to him in money. He estimates the value of the title in the sum he agrees to pay for it; *he makes, by his contract, the purchase money the measure of the value of the title,* and takes security in that amount. Such seems to me to be the *intention* of the parties, and they ought to be held to their contract. It is right that the vendor should pay interest, because he has had the use of the purchaser's money, and is presumed to have made interest; it is right that the purchaser should receive interest, for although he has had the use of the land, its rents, issues and profits, yet he is liable to refund them to him who has the paramount title. *He* seems to be the favored per-

son ; for at Law *he* gets the land and the improvements. Yet, not always so in Equity, for it is settled, that if he is compelled to go into a Court of Equity, to assert his title, (upon the principle that equity must be done by him who asks it,) an allowance will be made in favor of the purchaser, in most cases, for his improvements. If he has acted *bona fide*, without notice of the owner's title, a Court of Equity, in decreeing an account, will allow him to deduct, therefrom, a due compensation for them. *Story's Eq. sec.* 799, 1237. *Sugden on Vendor,s ch.* 16, *sec.* 10, *p.* 720, 721, *7th Ed. Putnam vs. Ritchie*, 6 *Paige,* 390, 405, 406. *Green vs. Biddle*, 8 *Wheat.* 1.

The purchaser, however, cannot himself move in a Court of Equity for such compensation ; and, for the life of me, I can see no reason why he should not. *Sugden on Vendors, ch.* 16, *sec.* 10, *p.* 722. 1 *J. Ch. R.* 385. 1 *Ibid*, 26, 39. *Story's Com. on Eq.* 799. 6 *Paige,* 390. I understand the technical reason why he cannot, but I see no reason why he may not, upon principle. Just such a reason, (to-wit, that the purchaser is the movant,) as precludes him from an allowance for his improvements, when there is no fraud on his part, and when he is without notice of the true owner's title, ought to be overridden and broken down by the Courts of Chancery—Courts which are said to look to substance, and not to forms. Whether he is a complainant or defendant in Equity, his equity remains the same. I know of no principle, *equal* and *good*, which can take the money, or the value of any kind which belongs to A, and appropriate it to B. It would seem to be just that the legal title of the true owner should be held encumbered with the equity of the tenant, growing out of his improvements, whatever, in each case, they might be proven to be. The rule of the Common Law, as to damages, is said to operate with great severity upon purchasers, where the vendor has acted in bad faith, as where he has either fraudulently withheld the truth, or suggested falsehood in relation to the title. But for this, it may be replied, the grantee may have an action on the case, in the nature of a writ of deceit and recover to the full extent of his loss. *Cruise, tit.* 38, *c.* 5, *s.* 57. 1 *Inst.* 384, *a. n.* 1. 2 *Caines*, 193. 1 *Fonbl. Eq.* 366. 1 *Com. Dig.* 236, *a.* 8. *Van Ness, J. in Pitcher vs. Livingston.* 4 *John. R.* 12.

In the United States, the weight of authority is in favor of the rule as enforced at Common Law. See *Staats vs. the Exrs. of*

Davis and others *vs.* Smith and others.

*Ten Eyck*, 3 *Caines*, 111. *Pitcher vs. Livingston*, 4 *John. R.* 1. *Bennett vs. Jenkins*, 13 *Johns. R.* 50. · *Marston vs. Hobbs*, 2 *Mass.* 433. *Caswell vs. Wendell*, 4 *Mass.* 108. *Smith vs. Strong*, 14 *Pick.* 128. *Sterling vs. Peet*, 14 *Conn.* 245. *Bender vs. Fromberger*, 4 *Dall.* 441. *Wilson vs. Forbes*, 2 *Dev. N. C. R.* 30. *Seamore vs. Harlan*, 3 *Dana*, 415. *Tapley vs. Labeaume*, 1 *Missouri*, 552. *Martin vs. Long, Ibid*, 391. *Earle vs. Middleton*, 1 *Cheves Law & Eq. S. C. R.* 127. *Duckmaster vs. Grundy*, 1 *Scam. R.* 312, 313. 8 *Mass.* 163, 221. *Hinning vs. Withers*, 2 *Tred.. Const. Rep.* 584. *Ware vs. Wethnall*, 2 *McCord's R.* 413. *Bond vs. Quattebaum*, 1 *McCord*, 584. *Talbot vs. Bedford, Cook's Ten. R.* 447. *Lowther vs. the Commonwealth*, 1 *Harr. & Munf.* 202. *Crenshaw vs. Smith*, 5 *Munf.* 415. *Stout vs. Jackson*, 2 *Rand.* 132. *Stewart vs. Drake*, 4 *Halst.* 139. *Cox vs. Strode*, 2 *Bibb*, 272. *Threlkeld, vs. Fitzhugh*, 2 *Leigh*, 451. 1 *Blackf.* 266, note. 2 *Ibid*, 274. 3 *Ohio*, 221. 10 *Mass.* 459. 3 *Harris*, 211. 1 *Mississippi*, 550. 2 *Greenlf.* 378. 1 *Litt.* 250. 3 *Ibid*, 118. 3 *Mississ.* 391.

The circuit Judge held, that judgments obtained against the administrator, Flewellen, had no preference in the distribution of the assets among creditors, over debts of the same or higher grade, not in judgment. At Common Law, a creditor who sues and reduces his debt to judgment, has preference over debts of the same dignity, not in judgment, but no preference over debts of higher dignity, not in judgment. To the extent of a preference over debts of equal dignity with that upon which his judgment is founded, the diligence of the judgment creditor alters the course of administration, and no farther. *Ashley vs. Peacock*, 3 *Atk.* 308. *Wentworth's Office of Executors*, 14 *Edition, page* 270. 1 *Williams' Exrs.* 729. *Wootering vs. Stewart, et al.* 2 *Yeates*, 483. *Scott vs. Ramsay*, 1 *Binn.* 221. *Prevost vs. Nichols*, 4 *Yeates*, 479.

Our Statute expressly precludes *any preference* between debts of equal dignity, where there is a deficiency of assets, " except in cases of judgments, mortgages that shall be recorded, from the time of recording, and executions lodged in the sheriff's office, the eldest of which shall be first paid, or in those cases where a creditor shall have a lien on any part of the estate." *Prince*, 229. By which we understand that liens, by judgment, mortgage, or otherwise, against the estate, shall be respected according to their dates. These exceptions apply to liens only, existing at the death of the testator or intestate.

Davis and others *vs*. Smith and others.

As then among creditors, both at Law and in Equity, the grade of debts is to be ascertained by the nature of the debts, as they exist at the death of the decedent. This is settled by our Statute, and the administrator must abide it at his peril. He may go into Equity, as he has done in this case, and ask a decree for direction; and creditors may also resort to a Court of Chancery to compel a distribution of assets; but in either case the legal priority of debts, as fixed by the Statute, remains the same. On this point, the judgment of the Court below is affirmed.

The counsel for the creditors who obtained judgment against the administrator, maintained in the Court below, and insisted before this Court, that the administrator, having failed to plead in defence of their actions against him, the claim of the Laneys, founded on their covenant of warranty, if by now letting in their claim to share in the assets of the estate, their judgments are not fully paid, the administrator should be held personally liable for the deficit. They asked the circuit Judge so to charge, which he declined to do. The evidence on the record does not show that the administrator had notice of any defect in the title to the lands sold by his intestate to Laney, at the time these judgments were rendered against him; and it does show that the breach of the warranty by eviction, occurred after the judgments were rendered. As between creditors, we have seen the effect of these judgments. The assets being in the hands of a Court of Chancery, for distribution, it was competent for that Court to let in the claim for damages founded on a broken covenant, according to the dignity of that debt, as fixed by law. But this does not relieve the administrator from any personal liability which has attached to him by reason of a failure to plead, or of a defective plea.

[7.] It is his duty when sued, so to plead as to protect all the creditors of whose debts he has notice, in their rights, according to the dignity of their debts, as established by law; and if he fail to do so, he becomes personally responsible. He is cognisent of the amount of assets in his hands—it is his duty and also his interest to exhibit the assets—his actings and doings in the administration—the debts due, their dignity, &c. and cause a judgment to be entered, which will protect all parties in interest, and himself also, and if this cannot be done at law, he has the right to invoke the aid of a Court of Chancery. If, therefore, there were

demands against him, of which he had notice, of equal dignity, and of greater amount than the value of the assets in his hands, at the time of the rendition of these judgments, and he failed to plead them, so as to protect himself, he is individually chargeable. And equity will not distrust the relation which the law has established between himself and the judgment creditors.

[8.] We hold, however, that inasmuch as it does not appear that the administrator had notice of any debt due on this covenant of warranty, at the time the judgments were rendered, the breach of that covenant not in fact occurring until afterwards, he is not guilty of a devastavit in not pleading it. Until the condition of a contingent security is broken, the administrator may not respect it, as a debt due. They do not stand in the way of debts of inferior dignity. The payment of a simple contract debt, before a bond conditioned for indemnity, is good, if no breach has taken place. It is settled, that if, subsequently to the payment of a simple contract debt, the contingency should happen upon which a bond is payable, and it is put in suit, the plea of the payment of the simple contract debt will be a good defence for an executor. Aside from the doctrine which, as stated, regulates contingent securities, an executor, or administrator is not guilty of a devastavit, if he fail to plead a debt of which he has not had notice. As to these points, see *Harrison's case,* 5 *Coke,* 286. *Phillips vs. Echard, Cro. Jac.* 8. *Cro. Jac.* 102. *Woodcock vs. Hern, Goldsb.* 142, *pl.* 57. *Robinson vs. Francis, Bridgm.* 79, *s.* 6. 1 *Roll, Ab.* 925, *tit. Executors,* 2 *pl.* 3. 1 *Roll, Rep.* 405, *pl.* 36. *Lacy vs. Fairchild,* 2 *Verm.* 101. *Hawkins vs. Day, Ambl.* 160. *S. C. Dick.* 155. *Read vs. Blunt,* 5 *Sim.* 567. 2 *Wms. executors,* 745-6. As to notice, see 2 *Bac. Abr.* 82, *tit. executors,* (*L.*) 2 *Fonbl. Treat. Eq. b.* 4, *pt.* 2, *c.* 2, *s.* 2, *note,* (*n.*) *Harman vs. Harman,* 2 *Show.* 492, *S. C.* 3 *Mod.* 115. *Booking vs. Jennings,* 1 *Mod.* 175. *Davis vs. Monkhouse, Fitzgib,* 76. *Buller N. P.* 178. 2 *Williams' ex'rs,* 751, 752. *Prince's Dig.* 229.

[9.] The relation which Smith, who claims to be a creditor of the estate of Harris, bears to the case, requires a more minute exposition than has yet been given. He, (it appears from the record,) sold a tract of land to Harris, in his life time, taking his notes for the purchase money, and executing to him his bond for titles, when they were paid. A judgment, for say half the sum, was obtained against Harris before his death, the greater

part of which has been paid. Smith was indebted to one Hays, about the amount of the remainder of the purchase money for the land, not in judgment. It was agreed between Harris and Smith, that Harris, in payment of that balance, should take up Smith's note to Hays, by substituting his own, with Smith as surety, which was done, and at the same time, there was a verbal understanding or agreement between them, that Smith should hold the legal title to the land, as a security against his surety-ship on the note, and if he had it to pay, that the original debt should be considered still due. Previous to this time, however, Harris had sold the land to Noah Laney, and made a deed to him, with the covenant of warranty, upon which covenant the claim of the heirs of Noah Laney, of which I have before treated at large, is predicated. This sale was known to Smith, at the time of the substitution of Harris' note for his, to Hays, and of the verbal agreement aforesaid. Laney had no notice of Smith being still the holder of the legal title to the land. Smith paid the note of Harris to Hays as surety. Afterwards he brought suit for the land in Alabama, and recovered it, upon his title, evicting the heirs and distributees of Noah Laney. Upon this state of the facts, Smith claims that the substitution of Harris' note for his, to Hays, was not a payment by Harris of the debt, or balance of the debt, due to him for the land, and that he is still a creditor of the estate of Harris, upon the original contract of sale, and as such, entitled in equity, to be first paid out of the assets in the hands of the administrator. We consider, that the substitution of Harris' note for Smith's, to Hays, was in Law and in Equity, a payment to that amount of the purchase money due by Harris for the land, and extinguished all claim for it against the administrator growing out of the original contract of sale.

Upon that payment Harris was entitled to a deed for the land, and now in Chancery, upon all the facts of this case, must be considered as acquitted from all obligations growing out of the contract of sale. The verbal agreement could not re-invest Smith with the rights which he originally held under the contract of sale. That is an independent transaction. He could not discharge and re-affirm that contract at the same time. Perhaps, if the land had not been at the time sold to Laney, with the knowledge of Smith, or if Smith had not elected to pursue his legal rights against the land, we might consider the equities between Smith and the estate of Harris, as different from what we now consider

them.   The contract of suretyship must stand on its own bot-
tom.   Smith having paid the debt of his principal, Harris, to
Hays, is subrogated to all the rights of the payee, in the distribu-
tion of those assets.   As we now rule, he is let into a *pro rata*
participation, as a specialty creditor, the debt for which he was
surety being by note, and notes being classed by our Statute
with bonds, or other obligations.

But let it be conceded that the verbal agreement, to-wit, *that
if Smith as surety had the debt to pay, the original consideration
money, to that amount, is to be considered as due*, is operative on
this case, then how stand the equities between himself and the estate?
What kind of case does Smith's answer make?   He sells land to
Harris and takes his notes for the purchase money, binding him-
self in a bond to make titles when the purchase money is paid.
One half the money he has collected.   He enters into an agree-
ment with Harris, by virtue of which Harris is to take up his
notes to Hays for the amount, say of the other half, with his own
note, he, Smith, becoming his surety, with a farther understand-
ing, that if he pays it as surety, the purchase money is then to be
considered as due and owing.   He pays as surety.   At the time of
this arrangement the land was sold under covenant of warranty
to Laney, and this sale was known to Smith.   Electing to seek
payment of this purchase money, by resorting to his legal title,
and thus, as we hold, rescinding his contract of sale *to* Harris, he
brings ejectment for the land against Laney, the assignee of Har-
ris, and recovers it, and now holds it.   By this eviction there is
a breach of Harris' covenant to Laney, and by the voluntary act
of Smith, his, Laney's, claim for damages is brought down upon
the estate ; which claim this Court is compelled to allow.   And
now, in a Court of Chancery, having received in cash one half
his purchase money; having recovered, and now holding the en-
tire tract of land; having voluntarily resorted to his security in
the land for the balance of his purchase money, and thereby caused
a breach of the covenant to Laney, and charged Harris' estate
with the value of the land and interest at the time of the sale—
he asks that, in addition to all this, he shall be paid the balance
of the purchase money.   The equities are against him.

The estate of Harris, if his claim is allowed, would lose the
land and all the purchase money.   As Chancellors, we are con-
strained to hold him to his election.   He has elected to rescind

the contract of sale.   He cannot now claim in inconsistent antag-
onist rights.   He cannot come here affirming the contract and
ask his purchase money, whilst, at the same time, renouncing it,
he claims the land.   He must do equity, if he is to be allowed
equity.   Had he offered in his answer to convey the land to the
estate of Harris, the case would be different.   He is to receive
equity according to the case he makes.   He occupies before this
Court the position of a vendor, seeking a specific performance
of his contract, under such circumstances as are stated in his an-
swer.   Could he, under such circumstances, have a decree?   I
apprehend no Chancellor would grant it.   Our judgment, there-
fore, is that he refund the purchase money which he has received,
with interest, and that he be excluded from all participation in
the assets of this estate, on account of the balance of the pur-
chase money, not received.   And as he is entitled to share, on
account of his contract of suretyship, that the claim of the estate
against him for the purchase money paid, be offsetted with what-
ever dividend, when the account is taken, he may be entitled to
as surety.

The administrator, Flewellen, was notified by the Laneys to
appear and defend the suit for the land, brought by Smith, in the
State of Alabama.   He did not appear and defend, as required
by the notice.   The Court was requested to charge, that in dis-
regarding this notice he was not guilty of a devastavit, because
he could not, in his character as administrator, derived from the
authorities of Georgia, become a party to a suit in Alabama.
And farther, that in as much as he could not defend the action of
ejectment in Alabama, the recovery of the land there, was no
breach of the warranty of Harris to Laney.   The inference
which counsel sought to draw from these two propositions was,
that the Laneys were not entitled to share, upon the covenant to
Noah Laney, in the assets in the hands of the administrator.   The
Court declined to charge as requested, no doubt considering that
the point aimed at was covered in his instruction already given,
that, if there was a breach of that covenant, they should be let
in to the distribution.   Upon this refusal, however, error is as-
signed, and it becomes necessary for us to express an opinion
upon both the propositions.

[10.] An administrator or an executor derives his authority
from his letters of administration or testamentary.   As such, he

has no powers beyond the limits of the State by whose authority he is invested with the trust. He cannot sue, therefore, nor can he be sued in any other State. If it becomes necessary to sue, in behalf of the estate which he represents, in a foreign State, he must obtain letters of administration in that State, according to the provisions of the law of that State. If he cannot sue or be sued in a foreign State, he cannot be permitted to come in under a notice, and defend a suit there. His official character, derived from the letters granted to him, in Georgia, is not recognised in Alabama for any such purpose. He cannot, therefore, be liable as for a devastavit, in this case, because he did not, in pursuance of the notice of the suit for the land in Alabama, defend that suit. He is not to be made personally responsible for not doing what the laws of the land will not permit him to do. *Story's conflict of Laws*, sec. 513. *Lee svs. Moore. Palmer R.* 163. *Tourton vs. Flower,* 3 *P. Will.* 369, 370. 2 *Vesey,* 35. *Att'y Gen'l vs. Cockerell,* 1 *Price,* 179. *Burn vs. Cole, Ambler R.* 416. 2 *Madd. R.* 101. 1 *Hagg. Eccl. R.* 93, 239. *Fenwick vs. Sears,* 1 *Cranch,* 259. 3 *Ib.* 319, 323. 9 *Wheat.* 565. 12 *Ib.* 169. 2 *N. Hamp. R.* 291. 4 *Randolph R.* 158. 2 *Gill & Johns.* 493. 5 *Green.* 261. 3 *Mass.* 514. 20 *Mart.* 232. 3 *Day Conn. Cas.* 74. 4 *Mason,* 16. 20 *John.* 229, 265. 5 *Peters,* 518. *S. C.* 2 *Mylne & Craig,* 89, 109.

[11.] It does not follow, however, because the administrator could not, and did not defend the action of ejectment in Alabama, that there was no breach of the warranty.

[12.] Eviction is a breach of a covenant of warranty, and it is conceded by this record, that the Laneys were evicted by judgment of a Court of competent jurisdiction in the State of Alabama, and a possessory process issuing from that Court. That is sufficient. The record of the judgment in the ejectment, and of all the proceedings had under it, including the execution of a writ of possession, is appended to the record brought up to this Court. The only question is, what force and effect has that judgment in Georgia. It has the force and effect of a domestic judgment. There it would be evidence of eviction, notwithstanding the administrator did not appear and defend; it is the stronger evidence of a breach, on that account. Here it is evidence of the same fact. It may be impeached here, for fraud; and the jurisdiction of the Court which rendered it, may be inquired into, or

the right of the State of Alabama, to exercise authority over the persons who are parties, and the subject matter. With these limitations, it is to be taken and held for all purposes in our Courts, as it is taken and held in Alabama. *Const. U. States,* 1 *sect.* 4 *art. Acts of Congress,* 26*th May,* 1790 *; 27th March,* 1804. 3 *Story on the Constitution, sec.* 1307. *Story's Conflict of Laws, sec.* 609. *Latine vs. Clements,* 3 *Kelly,* 426. *Mills vs. Duryee,* 7 *Cranch,* 481. *Hampden vs. McConnell,* 3 *Wheat.* 234. 1 *Kent's Comm.* 243, 244. *Sergeant on the Constitution, chapters* 31--33. 9 *Mass.* 462, 467. *Shumway vs. Stillman,* 4 *Cowen R.* 292. *Borden vs. Fitch,* 13 *Johns. R.* 121.

[13.] In connection with this branch of the case, it is most convenient to notice another request of counsel, to wit, that the Court should instruct the jury, that if the eviction of Laney was collusive and by consent between him and Smith, it was no evidence of a breach of warranty. Such instruction would have been proper. The judgment of the Court in Alabama, I have stated, can be impeached here, for fraud. If there was any evidence of such fraudulent consent, it ought to have been submitted to the jury. We do not say that there was.

An eviction procured by fraudulent consent, is no breach of a covenant of warranty of title.

[14.] The eviction must be upon title paramount. Proof of such fraud, would preclude the idea of eviction upon title. Whether there was fraud or not, is a question for the jury. *Taylor vs. Bryden,* 8 *Johns. R.* 173. *Emmerson vs. Proprietors in Minot,* 1 *Mass.* 464. 2 *Hill's N. Y. Repts.* 105. 4 *Kent's Com.* 471. 2 *Saund. R.* 178, *notes* 7, 8, & 10. 2 *Johns.* 1. 7 *Wend.* 281. 21 *Wend.* 121. 9 *Wend.* 416. 4 *Pick.* 87. 5 *Conn.* 497. 3 *Serg. & Rawle R.* 364. 10 *Wheat.* 449. 1 *Dana,* 306. 1 *Ohio* 180. 3 *Fairf.* 499.

Let the case be remanded, with instructions,