### IN THE

# SUPREME COURT OF THE STATE OF GEORGIA,

# AT AMERICUS,

## JULY TERM, 1851.

Present—JOSEPH H. LUMPKIN, }
    HIRAM WARNER, } Judges.
    EUGENIUS A. NISBET, }

No. 5.—THOMAS RAGLAND, administrator of SAMUEL F. JONES, deceased, plaintiff in error, *vs.* THE JUSTICES OF THE INFERIOR COURT, for the use of ELIZA A. JONES, defendant.

[1.] In a suit on a guardian's bond, by the ward, against his guardian alone, it is not good cause for non-suit, that the plaintiff has not averred and proved a judgment or decree against the guardian, in his representative character, because the suit is against him in that character.

[2.] When returns re made by an executor, administrator or guardian, to the Clerk of the Court of Ordinary, under the Act of 1820, it is the duty of the Court to pass them to record, or reject them at the next term of the Court after they are rendered to the Clerk, and if judgment is had, after that time, passing them to record, such judgment is irregular, and may be set aside, by a proceeding properly instituted for that purpose; but such judgment cannot be attacked collaterally, and will be sufficient whilst unrevoked, to admit the returns in evidence, in a suit by a ward against his guardian.

[3.] A minor whose parents are in life, and who has a separate estate: *Held*, to be an orphan, in the meaning of the Act of 1799, entitled "an Act for

Ragland *vs.* The Justices, &c.

the better protection and security of orphans and their estates," and entitled to the preference therein given to orphans.

[4.] Property mortgaged and not sold under the mortgage at the death of the mortgagor: *Held,* to be assets in the hands of his executor or administrator, out of which, orphans are entitled to be paid to the exclusion of the mortgage creditor.

[5.] In Georgia, a mortgage does not transfer the legal estate, and is an incumbrance or security for a debt only.

[6.] The preference given to orphans and deceased persons, under the Act of 1799, overrides all liens upon the property of a deceased guardian, executor or administrator.

[7.] The only bar to a suit by a minor against his guardian on his bond, is the term which the Statute prescribes for sealed instruments.

Debt, in Macon Superior Court. Tried before Judge WARREN, March Term, 1851.

This was an action for the use of Eliza A. Jones, against the representative of the estate of Samuel F. Jones, her father and natural guardian, upon the bond given by him as guardian.

Defendant's counsel demurred to the declaration, and afterwards moved for a non-suit on the same ground, viz: that the declaration did not show, nor was there any proof that a decree or judgment of a Court of competent jurisdiction had been rendered, fixing the debt or sum for which defendant's intestate was liable, before this suit on his bond. The Court overruled the demurrer, and motion for a non-suit, and error is assigned thereon.

Plaintiff's counsel offered in evidence, a certified copy of a paper purporting to be a return of Jones as natural guardian. The return was lodged with the Clerk of the Court of Ordinary, in vacation, in the year 1844. In 1848, the Court of Ordinary, by an order, directed (Jones being dead) the return to be recorded. Defendant's counsel objected to the copy going in evidence, on the ground that the order of the Court of Ordinary was void. The Court overruled the objection and admitted it in evidence; and this decision is assigned as error.

Defendant's counsel offered in evidence, a mortgage made by intestate in his life-time, covering several negro slaves, and also

Ragland *vs.* The Justices, &c.

sundry *fi. fas.* against Jones, and to prove that the property mortgaged had been sold by the Sheriff under the mortgage *fi. fa.* and the money paid to the mortgagee. The Court rejected the evidence, and this is assigned as error.

Defendant's counsel offered to prove that the plaintiff below, Eliza A. Jones, was 21 years old, more than four years before the death of Samuel F. Jones. The Statute of Limitations having been pleaded, the Court rejected the evidence, and this also is assigned as error.

S. & D. MILLER, for plaintiff in error.

G. R. HUNTER, for defendant.

*By the Court.*—NISBET, J. delivering the opinion.

[1.] This suit is brought against the representative of a deceased guardian, on his bond, to recover the estate of his ward. The sureties are not sued. It is the same as if the guardian, being in life, was sued on his bond. The motion to dismiss the action, and the motion for a non-suit after the evidence for the plaintiff was closed, go upon the ground that before a recovery can be had against a guardian, in his personal character, there must be a judgment or decree against him, in his representative character. This suit is for the very object claimed by the plaintiff in error. The guardian is here sued as guardian. It is on account of his trust as guardian, and for a default therein, that he becomes liable on his bond. In the argument, counsel for plaintiff in error, insisted that a guardian could be called to account only in a Court of Chancery. Not so; he may be equally sued at Law. He is liable at Law on his contract with the Ordinary —his bond. Independent of his bond, the plaintiff could proceed against him at Law if he was willing to take the risk of making out his case at Law. By our Statute, a party is not driven into Equity, if he conceives that he can establish his claim without resort to the conscience of the defendant. *Cobb's New*

*Dig.* 464. *Justices, &c. use of Davis vs. Hemphill,* 9 *Ga. R.* 65.

[2.] The returns from the records of the Court of Ordinary, were properly admitted in evidence. It appears that these returns were made by the guardian in his life, to the Clerk of the Court of Ordinary, under the Act of 1820, in February, 1844, and were not passed to record until July 1848. At that time, they were recorded in pursuance of an order of the Ordinary *then* passed. The objection to the admission of this paper is, that the Act of 1820 requires returns recorded by the Clerk in vacation, to be passed to record or rejected at the next succeeding term, and that this was not done in this case, but on the contrary, these returns were not passed to record until four years or more, after they were received by the Clerk. We think that the counsel for the plaintiff in error, is right in his construction of the laws regulating the subject matter, whilst we hold the objection insufficient to exclude the evidence. The Act of 1820 does not, in so many words, declare that the Court of Ordinary shall pass or reject returns made to the Clerk in vacation, at the next succeeding term, but we think such, notwithstanding, was the intention of the Legislature. The Act of 1810 (*Cobb's New Dig.* 317.) makes it the duty of the Court, where returns are made to the Court, after examining, to approbate or reject them, and if approved, to order the Clerk to record them. *When* to order them to record? Clearly when they are presented—at the term when they are presented. This is the general law. Prior to the Act of 1820, returns could only be made in term. That Act authorizes executors, administrators and guardians to exhibit their accounts and vouchers to the Clerk of the Court of Ordinary, at any time when the Court is not in session; and makes it the duty of the Clerk to qualify them to the correctness of their accounts, and to examine them and their vouchers, and make a special report to the *next Court of Ordinary,* of the correctness and reasonableness of such accounts, " upon which report, (says the Act,) the said Court shall either pass or reject such accounts, or any part thereof." *Cobb's New Dig.* 320. This Act of 1820 and the Act of 1810, are in *pari materia,* and are to be construed together. The Act of 1810

Ragland *vs.* The Justices, &c.

requires the Court of Ordinary to order returns to be recorded. That duty is not dispensed with by the Act of 1820. The Ordinary is bound to order returns to be recorded, made under the Act of 1820, as well as returns made under the Act of 1810, in Term, under and by virtue of the Act of 1810. If, as we think, returns made under the Act of 1810 are to be passed upon and ordered to record at the term when rendered, then we say, that Act requires that returns made to the Clerk under the Act of 1820, shall also be passed upon and ordered to record, when such returns are submitted to the Court for rejection or approval; and that is, by the Act of 1820, at the next term after they are rendered to the Clerk. From the fact that the Legislature requires the Clerk to report the accounts to the *next Court of Ordinary*, after they are rendered to him, it is fairly inferable that they intended the Court to pass judgment on them, and if approved, to order them to record at that term. Why require him to make report to the *next term*, unless for the purpose of *then* having the judgment of the Court on their correctness, and for the purpose of having its judgment *then* on their fitness for record? This construction is not only in accordance with the general policy of our laws upon this subject, but any other construction would defeat that policy. The returns are required to be recorded, that wards, distributees, legatees and all other parties in interest, may know the condition of, and their rights in, the estate represented by an executor, administrator or guardian, as the case may be, and that they (the trustees) may have a perpetual memorial for their protection. If returns may lie unrecorded in the hands of the Clerk, inaccessible and removable, capable of loss or destruction, for years, or even for months, these objects cannot be attained, as to the sufficiency of the objection. For the reasons given, the judgment of the Ordinary passing these returns to record four years after they were rendered to the Clerk, is an erroneous judgment—it is irregular, in this, that it was pronounced after the term of the Court of Ordinary next following the rendering of the returns to the Clerk. But it is not a void judgment. It is the judgment of a Court of competent jurisdiction, and cannot be collaterally assailed. It

is a valid judgment, until set aside by a proceeding instituted before the Court which rendered it, for that purpose, and as such, it is sufficient to admit the returns in evidence. 4 *Geo. R.* 47. 9 *Geo. R.* 246.

[3.] The plaintiffs below, in making out their case, had proven that certain slaves had come into the possession of the administrator of Jones, the guardian, as assets belonging to his estate. The plea of *plene administravit* was filed. To support this plea and to show that these slaves were not assets, the defendant below tendered in evidence a mortgage deed for them, executed by Jones, in his life-time, to A. H. Flewelen, the record of foreclosure, and *fi. fa.* which issued on the judgment of foreclosure, and entries thereon showing that the negroes had been sold by the Sheriff. This evidence was repelled, and the defendant below excepted. In support of this exception, counsel made two points. *First,* they insist that the usee of the plaintiff in the case is not within the preference given to orphans, by the Act of 1799, because, when the estate was given to her, and when her father was appointed her guardian, her parents being in life, she was not an orphan. This being so, the mortgage foreclosure, &c. ought to have been admitted, to show an appropriation of the slaves, legal and valid against her claim, aside from that preference. Now it is true in ordinary parlance, that a child whose parents are living is not an orphan. And it is also true, that the Act of 1799, uses the word *orphan.* It is as follows: " When any guardian, executor, or administrator, chargeable with the estate of any *orphan* or deceased person, to him, her or them committed, shall die so chargeable, his, her or their executors, or administrators, shall be compellable to pay out of his, her or their estate, so much as shall appear to be due to the estate of such orphan or deceased person, *before any other debt of such testator or intestate.*" *Cobb's New Dig.* 288. In construing an Act of the Legislature, we look first of all for the intention. What did the Legislature intend by the word *orphan* in this Act? If the meaning was wholly free from doubt, no interpretation would be admissible, for any construction variant from the clear meaning of a Statute, would be judicial legislation. The mean-

ing in this Statute is not perfectly unambiguous and therefore, we resort to interpretation. The words of an Act, the subject matter, and the reason or motive which prompted it, are among those things proper to be considered in the ascertainment of the legislative mind. The subject matter of this Act is the estate or property of minors—and the purpose or motive of the Legislature, was its security and protection, in the hands of a guardian, at his death. The usual popular meaning of words is ordinarily to be adopted, yet not necessarily or universally. They are to be considered as having regard to the subject matter—that is presumed to be always in the eye of the legislator. Hence when a word or words are of doubtful meaning, in the application of a Statute, the subject matter may dissolve the doubt and fix their meaning, so as to make it harmonise with the object of legislating upon the subject matter at all. Looking to the subject matter of this law, the estates of minors; and looking to the reason and object of the law, the protection of these estates ; it will be impossible to conclude that, when the Legislature speaks of an *orphan*, it meant to designate alone a minor whose parents are dead. These fall within every meaning of which the word is susceptible, and are of course embraced in the provisions of the law. With these signs of intention in view, I cannot believe that the Legislature had regard to the natural relations which a minor sustains to the rest of the world, in the use of this word. They did not intend it as descriptive of those alone, who are orphans in the customary use of the word; but they intended to describe a class of persons who are, by law, capable of acquiring property by gift or inheritance, and who, being minors, are incapable of representing their property, and which, on that account must be represented by a guardian. I say that this intention is inferable from the subject matter and reason of the law. A minor whose father is in life, falls within this class, as well as a minor whose parents are dead. *He* is capable of acquiring an estate—*he* can not represent it—*he* also must have a·guardian. A father has no power over his son's estate, but as trústee or guardian. 1 *Black.* 453. 10 *Page*, 373. *He* occupies to the subject matter the same relation that an orphan holds, and judging the law

in the light of the subject matter, it applies to *him*. And is he not equally within the reason of the law? His estate passes into the hands of a guardian also; he is, by reason of minority, equally liable to the frauds and cupidity of his guardian—his estate requires equally the protection which this Act gives. I do not know that the word has any definite legal meaning—certainly no technical meaning. A child situated as this is, is *quoad* its separate estate, and in any fair legal meaning of the term, *an orphan.* The words in a Statute are to be taken " in a lawful and rightful sense," according to Coke. *Coke's Litt.* 381, *b.* That is, according to a fair legal interpretation, as distinguishable from a literal meaning. " *Et qui hæret in littera hæret in cortice,* as often before hath been said." *Coke.* "In interpreting an Act of Parliament, (says Mr. *Smith,*) it is not, in general, a true line of construction, to decide according to the strict letter of the Act; but the Courts will rather consider what is its fair meaning, and will expound it differently from the letter, in order to preserve the intent." *Smith's Com. on Statutory and Constitutional Construction,* 659. 7 *T. R.* 196. *E. C. L. R. vol.* 46. *Ib.* 43. 11 *Rep.* ⁻3. *Coke's Litt.* 381, *b.* 3 *Rep.* 27. *Brown's Legal Maxims, p.* 299. 2 *Sumner R.* 345. Where a strict adherence to the letter will lead to *injustice,* the strict letter of the law will be controlled. *Smith's Com. on Stat. and Const. Const.* 662. 1 *Kent's Com.* 462. 15 *Johns. R.* 380. 14 *Mass. R.* 92. We cannot, in this case, adhere to the literal meaning of *orphan,* and thus throw out of the protection of this Statute, a large class who fall within its reason and spirit, and occupy the same relation to the subject matter, that those hold who are confessedly within its protection. This would be to make the law work injustice. Again, by the Act of 1823, which is an Act " more effectually to secure the property of *minors* against the mismanagement of their natural guardians, by requiring bond and security, as in other cases of guardianship," the Legislature have recognized minors whose fathers and mothers are in life, to be orphans, so far as to require the Ordinary to withhold their property from their natural guardians until they give security, &c. This Act may be considered as expressive of the legislative mind, as to

what class of persons are intended to be protected by the Act of 1799.   Cobb's New Dig. 322.   6 Geo. Rep. 401.

[4.]  Second, they insist that if the usee of the plaintiff in this case is within the provision of the  Act of 1799, yet the preference given to orphans in that Act, is a right to be paid, to the exclusion of all other debts, out of  the  estate  of  the  testator or intestate, and that property mortgaged during his life, and sold under the mortgage after his death, is no part of his estate—is not assets in the hands of his administrator or executor.   In brief, they hold that the orphan is not to be paid, to the exclusion of a mortgage creditor of his guardian.   We differ with the learned counsel.   I am not prepared to say, but that in England, mortgaged property is held not to be assets in the hands of the executor.   Whether well settled there upon principle or not, such is, I believe, the rule, upon authority.   Nothing but the equity of redemption is there assets; and it seems to be rather an unsettled point, whether that is equitable or legal assets.   The rule in England goes upon the idea that a mortgage is a conveyance of the fee.   As to the effect of a mortgage in England, it will pay the curious student to examine an exceedingly able dissenting opinion of a learned and good man, (the late Judge Southard, of New Jersey,) which was adopted upon appeal.   1 Southard's N. J. Rep. 260.   2 Ib. 865.

[5.]  With us, this is not an open question.   We have decided, that a mortgage is but an incumbrance—a security with a lien—and that the mortgagor is not divested of the legal estate until foreclosure and sale.   At his death, therefore, there being then no foreclosure and sale, the guardian was seized of these mortgaged slaves—they were part of his estate, and subject to administration.   Out of them, as well as out of all the balance of his estate, the orphan is entitled to be paid, to the exclusion of all other debts, whether secured by lien or not.

[6.]  The preference given to the orphan, overrides judgment, mortgage and other liens.   It was the duty of the administrator to protect him and himself.   It was competent so to do, and if he has failed in his duty, his is the peril.   1 Kelly, 176.   Ibid, 266.   5 Ga. Rep. 274, 291.   With the same view, the defend-

ant below offered in evidence judgments against the guardian, which he had paid, which the Court ruled out, and correctly, for reasons already stated.   See especially, 1 *Kelly*, 266.

[7.] This being a suit at Law on the bond, no limitation term is applicable to it, but that which our Statute prescribes for sealed instruments.   The exception taken, therefore, on the ruling of the Court, repelling the evidence offered to support the plea of the Statute of Limitations for four years, cannot be sustained. 9 *Ga. Rep.* 328.

Let the judgment be affirmed.